PENTEK, INC., Appellant,

v.

Richard D. MEININGER, Appellee.

PENTEK, INC., Appellee,

v.

Richard D. MEININGER, Appellant.

Superior Court of Pennsylvania.

Submitted April 15, 1997.
Filed May 19, 1997.

George M. Medved, Pittsburgh, and Timothy B. Anderson, Harrisburg, for Pentek.

James T. Reilly, Lebanon, for Meininger.

Before CAVANAUGH, POPOVICH and OLSZEWSKI, JJ.

OLSZEWSKI, Judge:

The issues that this case brings before this Court range from nuclear to contractual meltdown. Shortly after the 1979 nuclear accident at Three Mile Island (TMI), Richard Meininger was directed by his employer, EG & G Idaho, to conduct tests on behalf of the U.S. Department of Energy at the TMI plant to determine how certain equipment survived the catastrophe intact. In the course of his studies, Meininger made the acquaintance of Sheldon Lefkowitz, president of Pentek, Inc., who was conducting similar experiments for one of Pentek's customers.

While working at the TMI plant, Meininger utilized a computer program/device known as the Electrical Circuit Characterization and Diagnostic System (ECAD) in order to survey the remote damage inside the reactor itself. The ECAD system, although workable and accurate, was quite complex and required intimate scientific and computer knowledge to be used.

Following his engagement at TMI, Meininger approached several industry sources with a proposal designed to make the ECAD system more user-friendly and, thus, commercially available to other nuclear plant owners as a routine maintenance program.

In the summer of 1986, Pentek agreed to fund the ECAD improvement project, and on July 1, 1986, the parties entered into an employment contract which outlined their respective duties and obligations. Under the terms of the agreement, Meininger, as program manager, agreed to work towards the marketing, improvement and commercialization of the ECAD system.

As an incentive towards achievement of this goal, the parties agreed that once ECAD sales reached $250,000 per year, a company separate from Pentek would be created that would be solely devoted to marketing and selling the ECAD system. Contingent upon proper funding, as delineated in the agreement, Pentek would hold fifty-one percent of the new corporation's stock and Meininger would hold the remaining forty-nine percent.

Further, the contract provided that, upon commencement of his employment, Meininger would receive sixty-five shares of Pentek stock. This stock was to be sold back to Pentek upon Meininger's termination. The parties agreed that the value of the stock would be determined by Pentek's accountant

in accordance with generally accepted accounting principles.

During the following three years, the ECAD improvement and commercialization project progressed smoothly. The most notable change to the ECAD system involved re-writing the computer program from the BASIC to the Turbo Pascal language. This translation made the system more commercially attractive, and both parties anticipated a sizable surge in industry interest and sales.

Sometime in 1989, however, a disagreement ensued as to whether ECAD sales were sufficient to trigger the spin-off corporation. As a consequence of this, Meininger resigned from Pentek on December 5, 1989. Several months thereafter, Pentek notified Meininger that, based upon its accountant's internal audit, the book value of Meininger's sixty-five shares of Pentek stock totaled $4,061.85. Meininger balked at the accuracy of this sum, alleging that the audit was not conducted in accordance with generally accepted accounting principles, as per the contract terms. Consequently, until an independent audit was performed, Meininger refused to tender his shares to Pentek.

Pentek then commenced the instant action in the court of common pleas of Lebanon County, seeking an order requiring Meininger to surrender his Pentek shares for the value previously determined by its accountant. Meininger reasserted his contention that an independent accounting was necessary in order to determine the true book value of the shares. Additionally, Meininger filed a cross-claim seeking, in part, a judicial determination that ECAD sales met the required $250,000 earnings point prior to Meininger's termination, thus mandating the creation of an independent subsidiary corporation in which Meininger would hold forty-nine percent of the stock.

Following a two-day bench trial, the Honorable John C. Tywalk entered a decree nisi which, *inter alia*, found that the ECAD system achieved "technological feasibility" prior to Meininger's employment with Pentek and that the technological feasibility date utilized by Pentek's accountant was incorrect. As a consequence of this, the court ordered an independent accounting of Pentek's records and directed that Pentek's costs be expensed or capitalized with reference to the technological feasibility date determined by the court. Additionally, finding that Pentek acted in bad faith and deliberately undervalued Meininger's stock, the court ordered that Pentek pay for the independent audit. Finally, finding that the required $250,000 threshold was never met, the court denied Meininger's cross-claim.

Meininger and Pentek filed post-trial motions to the decree nisi. By order dated March 18, 1996, the court denied all of the motions. Both parties then filed timely appeals.

■ In its first issue on appeal, Pentek avers that the trial court erred in finding that the ECAD system achieved technological feasibility as of May, 1986. Specifically, Pentek asserts that the trial court abused its discretion by disregarding the opinions of both parties' accounting experts as to when technological feasibility occurred and that the court's ultimate finding is, therefore, not supported by competent evidence.

This issue was hotly contested during trial because the value of Meininger's stock is directly tied to the date at which technological feasibility was achieved. That is, according to generally accepted accounting principles, costs incurred prior to technological feasibility are generally expensed, while costs incurred subsequent to technological feasibility are generally capitalized. The rationale for this principle is that research and development costs incurred prior to technological feasibility have no alternative future uses.

Both parties' experts testified that it is difficult to determine with precision the date upon which a product reaches this important point, and, although the accountants ultimately reached different conclusions, they agreed on the test to be applied when making this inquiry. According to the Financial Accounting Standards Board (FASB), computer software reaches technological feasibility when there is either a working model or a detailed program design.

Pentek's accountant and expert witness, Ronald Scanlon, testified that the ECAD sys-

tem achieved technological feasibility in October of 1987. Scanlon based his opinion on the fact that the first sale of an ECAD system programmed in Turbo Paschal, instead of BASIC, occurred in the fall of 1987. Prior to this sale, Scanlon maintained, the ECAD system had not met either of the requirements for technological feasibility outlined in Statement of Financial Authority Standard (SFAS) No. 86 because the reprogramming required a complete overhaul of the system.

Conversely, Meininger's expert, Brian Amerman, testified that Meininger had a detailed program design prior to entering into his employment contract and that the test for technological feasibility was already established upon the commencement of Meininger's employment with Pentek. Therefore, because Meininger was hired in July of 1986 and Pentek's new fiscal year began in November of 1986, costs incurred from November, 1986, onward should have been capitalized. Amerman based his opinion partially upon the fact that ECAD units were used and sold prior to Meininger's employment with Pentek, albeit utilizing the BASIC language. In Amerman's opinion, however, the reprogramming fit within SFAS–86's definition of "product enhancement" and, accordingly, did not alter the product's technological feasibility.

It is well-settled that "[i]f expert testimony conflicts, as it did here, the trial court must determine the weight and credibility that it will afford each expert." *Pennypack Woods Home Ownership Assoc. v. Board of Revision of Taxes*, 163 Pa.Commw. 80, 88–89, 639 A.2d 1302, 1306 (1994). *See also Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 480–81, 664 A.2d 525, 528 (1995) (it is the sole province of the factfinder to determine the weight and credibility given to expert testimony).

After hearing the conflicting expert testimony detailed above, and viewing the varied exhibits offered by the parties, the court determined that the ECAD system was technologically feasible prior to Meininger's employment with Pentek. In so concluding, it is evident that the court, sitting as factfinder, chose to credit Amerman's testimony as the more credible.

Moreover, Pentek's assertion, that the trial court disregarded the opinions of both experts, is belied by the record. Amerman unequivocally testified that, in his expert opinion, technological feasibility was achieved prior to Meininger's employment with Pentek. His determination that costs should have been capitalized as of November, 1986, was based upon the fact that that is the month at which Pentek begins its new fiscal year. Amerman did not testify, as Pentek asserts, that technological feasibility actually occurred in November of 1986. Pentek's brief at 11.

We therefore hold that the trial judge, sitting as factfinder, acted well within the bounds of permissible discretion in concluding that technological feasibility occurred prior to Meininger's employment with Pentek. Therefore, because this finding was supported by competent evidence, Pentek's initial issue must fail.

Next, Pentek asserts that the trial court erred in admitting the testimony of Meininger's expert witness, Brian Amerman. More precisely, Pentek avers that Amerman's testimony should have been excluded as a discovery sanction for failing to comply with the Pennsylvania Rules of Civil Procedure relating to disclosure of expert identity and testimony.

Pentek presents several arguments in support of this assertion. As each argument alleges the failure to comply with some portion of Rule 4003.5, governing discovery of expert testimony and trial preparation material, we will reproduce the pertinent portions of the Rule at the outset.

(a) Discovery of facts known and opinions held by an expert, otherwise discoverable under the provisions of Rule 4003.1 and acquired or developed in anticipation of litigation or for trial, may be obtained as follows:

(1) A party may through interrogatories require

(a) any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the subject matter on

which the expert is expected to testify and

(b) the other party to have each expert so identified by him state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

\* \* \* \* \* \*

(b) If the identity of an expert witness is not disclosed in compliance with subdivision (a)(1) of this rule, he shall not be permitted to testify on behalf of the defaulting party at trial of the action. However, if the failure to disclose the identity of the witness is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.

First, Pentek claims that Meininger violated section (a)(1)(a) of the Rule, relating to disclosure of an expert's identity. Specifically, Pentek claims that the disclosure of Amerman's identity six days prior to trial did not afford Pentek with sufficient notice and time to investigate the expert's credentials.

In response to an interrogatory from Pentek, Meininger responded that he intended to call, as an expert, an accountant from the firm of Amerman & Company. Additionally, Meininger briefly outlined the proposed trial testimony of the as-yet un-named expert, stating that the testimony would relate to whether Pentek's costs were properly expensed and capitalized.[1]

Thereafter, six days before trial, Meininger supplemented his response by identifying Amerman by name and further outlining his proposed trial testimony as well as the facts supporting such testimony. Although Pentek objected to Amerman testifying at trial due to the alleged dilatory disclosure, the trial judge allowed Amerman to testify. Counsel for Pentek cross-examined Amerman regarding his credentials and then stated that he had no objection to Amerman being qualified as an expert.

In light of this uncontroverted record evidence, we find Pentek's present challenge to be without merit. Indeed, Pentek's allegation that Meininger waited until "the eve of trial" to disclose his expert is without a factual basis. Pentek's brief at 17.

The purpose of subsection (a)(1) is to prevent a party from gaining an unfair trial advantage by withholding the identity of expert witnesses for so long that the opposing party is without the time and resources to investigate the witnesses' background, credentials and reputation. Instantly, Pentek was afforded six days to determine whether Amerman should properly be qualified as an expert and, at trial, stipulated to Amerman's credentials. We therefore hold that Pentek's present challenge is without merit and that Meininger's disclosure was in compliance with Rule 4003.5(a)(1)(a).

Pentek next claims that Meininger violated subsection (a)(1)(b) of Rule 4003.5 because Amerman's report did not set forth with specificity the expert's opinions and grounds therefor. Instead, Pentek claims, the report was merely conclusory and did not afford Pentek the opportunity to mount a meaningful and complete defense.

Meininger initially responded to Pentek's interrogatory as follows:

ANSWER:

Accountant from Amerman & Co., 205 Narrows Drive, Lebanon, Pa. It is expected that testimony will be presented showing that the value of ECAD Services, Inc. is understated on Pentek's books. That the value of agreements between Pentek and Mr. Meininger and/or ECAD are not considered or stated. Also, that R & D was expensed and not capitalized. Also that salaries, administrative costs and leases with management owned properties were and are excessive and unreasonable.

As previously stated, this answer was supplemented pre-trial with a letter from Amerman to Pentek in which Amerman stated that, in his opinion, Pentek's audit was not completed in accordance with generally ac-

---

**1.** The interrogatories were served upon Meininger on November 25, 1992, and were answered on March 29, 1993. Six days before the one-day trial, which was held on April 19, 1993, Meininger sent Pentek a supplemental answer.

cepted accounting principles because research and development costs were expensed, rather than capitalized. This, in turn, caused the value of Meininger's stock in Pentek to be undervalued.

After reviewing this discovery, we cannot agree with Pentek that Meininger's response was merely conclusory. In fact, Amerman's conclusion that the stock was undervalued was supported by the disclosure of his opinion that the cause for the undervaluation was the failure to correctly apply the relevant accounting principles. Moreover, Amerman specifically identified SFAS–86 as the significant accounting principle that he believed was wrongly applied in the initial, in-house, audit.

We therefore hold that Meininger did not violate Rule 4003.5(a)(1)(b). In compliance with the Rule, Meininger's initial answer and the later supplementation served to fully notify Pentek of Amerman's proposed opinions, conclusions and the grounds therefor. In light of the record evidence, Pentek cannot successfully claim pre-trial ignorance or unfair trial surprise.

■ Pentek's final assault on Meininger's compliance with the discovery rule concerns subsection (c), which states that an expert's trial testimony may not be inconsistent with pre-trial disclosures or go beyond the "fair scope" of discovery testimony. In support of this claim, Pentek alleges that Meininger's pre-trial disclosures did not specifically reveal that Amerman would testify regarding the date at which the ECAD unit achieved technological feasibility. Again, our independent review leads us to conclude that this allegation is baseless.

Although not using the exact words "technological feasibility," Meininger's answer and Amerman's report unequivocally stated that Amerman believed that research and development costs were expensed when they should rightfully have been capitalized. It is an elementary accounting principle that R & D costs are only expensed until such time as technological feasibility is achieved; costs incurred after this point are capitalized.

We find it implicit in Meininger's and Amerman's answers that Amerman would give his opinion as to when the ECAD unit was technologically feasible; it would otherwise be impossible for him to conclude that costs should have been expensed and not capitalized. Pentek's claim of trial surprise and resulting prejudice is, therefore, without merit.

■ Pentek's final claim on appeal is that the trial court erred in awarding attorney fees to Meininger. After reviewing the applicable statutory authorities and the trial court's stated justification for awarding the fees, we conclude that the trial court erred and, thus, we reverse that portion of the order.

Pursuant to 42 Pa.C.S.A. § 2503, counsel fees may be assessed against a party to an action that has, *inter alia,* acted in a dilatory, obdurate or vexatious manner either during the pendency of litigation or in commencing litigation. *See* 42 Pa.C.S.A. § 2503(6), (7), (9). Upon a finding of such behavior, an award of attorney fees lies within the sound discretion of the trial court; this Court will not disturb such an award absent a palpable abuse of that discretion. *See, e.g., Thunberg v. Strause,* 545 Pa. 607, 615, 682 A.2d 295, 299 (1996).

Instantly, although not specifying which subsection of § 2503 that it was relying upon, the trial court imposed attorney fees against Pentek as a sanction for its perceived **pre-litigation bad faith conduct.** As the trial court held:

> The basis of our decision was that Pentek engaged in bad faith conduct when it valued Meininger's shares of Pentek stock.
>
> \*   \*   \*   \*   \*   \*
>
> [T]he progress of this case, and the need for litigation at all, was influenced by the lack of fair dealing on the part of Pentek. Perhaps if a fair calculation of the stock's value had been made, based upon the evidence in Pentek's own records, a resolution of this matter could have been reached without resort to the Courts.

Without commenting upon the accuracy or propriety of the trial court's underlying conclusions, we can readily state, as we have in the past, that § 2503 does not apply "to

conduct that occurred prior to the commencement of this suit." *Rumbaugh v. Beck,* 411 Pa.Super. 220, 240, 601 A.2d 319, 329 (1991). *See also Cher–Rob, Inc. v. Art Monument Co.,* 406 Pa.Super. 330, 332–35, 594 A.2d 362, 364–65 (1991) (an award of counsel fees cannot be premised upon the fact that the winning party proved its case on the merits at trial).

We therefore hold that the trial court abused its discretion in awarding Meininger counsel fees based upon Pentek's pre-litigation actions. Accordingly, as there are no allegations or proof of bad faith conduct in the commencement of the suit or during the pendency of this litigation, the award is without statutory support and must be reversed.

■ We now turn to Meininger's cross-appeal, in which he claims that the trial court erred in finding that the requisite $250,000 threshold of ECAD sales was not met prior to Meininger's termination of employment and that, therefore, Pentek was not required to create a spin-off corporation in which Meininger would own forty-nine percent of the stock.

As previously stated, the parties' employment contract included a business incentive which contemplated the creation of a spin-off subsidiary corporation provided that certain pre-requisites were met. As a threshold, it was agreed that the ECAD business must reach $250,000 per year in gross revenue. At that point, the subsidiary corporation would be formed, with Pentek and Meininger holding fifty-one and forty-nine percent of the shares, respectively. Capitalization for the new company would be as follows: Pentek would make an initial investment of $51,-000. Meininger's initial investment, valued at $49,000, would be evidenced by the "intangible value" of the technology Meininger brought to the corporation. Thereafter, any additional monies expended were required to be matched by the parties on a dollar-for-

dollar basis in accord with their respective holdings.

On appeal, Pentek strenuously asserts that the threshold trigger level mandating creation of the new company was to be measured in gross service revenue per year, rather than gross revenue per year. This is an important distinction, for a company's gross service revenue may represent only a fraction of its overall gross revenue.[2]

The confusion as to which revenue controls stems from the fact that the parties' agreement was expressed in two writings, each of which contained language identifying a different trigger standard.

Paragraph (8)(a) of the Employment Agreement specifies:

> EMPLOYEE will seek to develop a profitable ECCAD services business (burdened engineering and technical labor exclusive of travel, equipment and other costs) to a level of **$250,000 per year gross revenues**, as determined by the cumulative revenues earned during each fiscal year.

Thereafter, the Agreement provides that, "upon attainment of the goal in subparagraph 8(a)" Pentek would take the necessary legal steps to form a subsidiary to support the ECAD technology. Finally, subsection 8(c) states that the guidelines for the new company's operations, should it be formed, would be outlined in "Exhibit B." Exhibit B, captioned "Guidelines For Forming A Subsidiary Company To Supply ECCAD Equipment And Services," [sic] provides that the spin-off corporation would be created at the threshold of "$250,000 per year in gross **service** revenues."

Pentek currently asserts that ECAD's gross service revenue was only a portion of ECAD's total gross revenue and that it was the parties' intent that gross service revenue be the controlling triggerpoint. While the trial court agreed with this assertion, our careful review of the record leads us to conclude that the parties contemplated total

**2.** A company's total gross revenue represents the sum of all of its various sources of revenue. The manner in which the company decides to characterize the various sources of revenue on its financial statements is discretionary, subject to applicable reporting guidelines. Most fundamentally, such sources may be categorized as revenue from the sale of goods or from the sale of services. Alternatively, they may be characterized based upon type of service, type of product, business segment or domestic or international location.

gross revenue to be the proper calculation. Accordingly, we are constrained to reverse the trial court.

At trial, Sheldon Lefkowitz, president of Pentek, testified as to his understanding of the terms of the spin-off incentive as follows:

> Q: Could you explain generally what the purpose of that provision was to your understanding?
>
> A: Well, since we had a goal of creating a commercially viable business from this idea that Meininger brought to us, we needed to establish in very simple terms the level of business that would allow us to feel comfortable, that this business was— would be self-sufficient, that it could provide without subsidy. We naturally started with a very small company, one, two, eventually three people and **we picked a number of a quarter of a million dollars of gross business a year as being a level that would establish itself as being able to pay the bills and show some kind of small profit**, if you will, it was a kind of breaking point that we picked.

N.T. 4/19/93 at 25 (emphasis added). *See also id.* at 26.

This testimony demonstrates that the $250,000 revenue point anticipated total ECAD business, *i.e.*, gross revenue, so that Pentek could be assured that the business would operate truly independent of Pentek and need no further subsidies and investments.

Our conclusion that the parties contemplated total gross revenue from the ECAD business, as opposed to gross service revenue only, is buttressed by several exhibits offered into evidence by Meininger. On June 29, 1989, Pentek sent Meininger a letter which outlined several *pro forma* steps that the parties had to take in order to finalize the creation of the spin-off corporation. These steps included: (1) formal resolution at Pentek's July board meeting to create the sub-

sidiary;(2) execution and implementation of incorporation activities pursuant to the Certificate of Incorporation for ECAD Services, Inc., which was previously obtained by Pentek, and; (3) execution of a new Employment Agreement between Meininger and ECAD Services, Inc.

Attached to this letter was a document entitled "ECAD Services, Inc. Accrued Investment." For the fiscal year 1989, which at that point covered only an eight-month period, Pentek's statement of income reads, in part, as follows:

BOOKED INCOME:

| | |
|---|---|
| Services | 51,922.52 |
| Equipment | 134,600.00 |
| Accounts Receivable | 83,416.21 |
| Total | $269,938.73 |

If, as Pentek now asserts, the parties agreed that gross service revenue would be the controlling trigger figure, then Pentek's June 29 letter would be inexplicably premature; for the service revenue at that time was just over $50,000. It is incredible that Pentek would send a letter seeking to formalize the creation of the subsidiary when only one-fifth of the goal was met.[3]

Rather, the more reasonable conclusion, and the one that is buttressed by the clear wording of paragraph 8(a) of the Employment Agreement and Pentek's president's own trial testimony, is that ECAD's total yearly gross revenue was to control in determining when, if ever, an independent corporation would be formed.

We therefore hold that the trial court erred in concluding that the parties' contractually agreed that the threshold sum would be calculated using the gross service income, rather then the total gross income, from the ECAD business.

3. We include this excerpt from Pentek's statement of income solely to demonstrate that the parties' contract terms contemplated that total gross income would control in determining whether the requisite triggerpoint was met. Because the trial court held that gross service income was the proper calculation, and further found that the ECAD business did not generate $250,000 or more in gross service income during the applicable time period, the trial court did not make a factual finding as to what Pentek's total gross income amounted to in this period. Accordingly, we are unable to conclude, as a factual matter, that Pentek's total gross income exceeded $250,000 and, presently, utilize this figure in an evidentiary capacity only.

The ORDER of the trial court, relating to attorney fees assessed against Pentek is REVERSED.

The ORDER of the trial court concerning the determination that the contractual trigger-point necessitating creation of the ECAD subsidiary corporation was never met is REVERSED AND REMANDED. On remand, the trial court is directed to conduct an evidentiary hearing to determine whether the ECAD business generated $250,000 or more in total gross income during Meininger's employment. If so, the court must then determine whether the subsidiary corporation, ECAD Services, Inc., was created prior to Meininger's termination of employment. If the subsidiary corporation was formed, the trial court must determine Meininger's interest therein, bearing in mind changes to the original capitalization. If not, the trial court is directed to fashion an appropriate remedy to fully compensate Meininger.

The ORDER of the trial court relating to the date at which the ECAD system achieved technological feasibility is AFFIRMED.

The ORDER of the trial court relating to the propriety of the admission of Brian Amerman's expert testimony is AFFIRMED.

Jurisdiction is relinquished.